FILED

10/11/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 22-0587

OP 22-0587

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 193

MELISSA GROO,

        Petitioner,

    v.

MONTANA ELEVENTH JUDICIAL DISTRICT
COURT, HON. AMY EDDY, Presiding,

        Respondent.

ORIGINAL PROCEEDING:    Petition for Writ of Supervisory Control
                             In and For the County of Flathead
                             Cause No. DV-22-087(A)
                             Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

        For Petitioner:

                David B. Cotner (argued), Brian T. Geer, Cotner Ryan Law, PLLC,
                Missoula, Montana

        For Plaintiffs Triple D. Game Farm, Inc., Lorney "Jay" Deist, and Kimberly
        Deist:

                Kris A. McLean (argued), Tyson A. McLean, Jordan A. Pallesi, Kris A.
                McLean Law Firm, PLLC, Missoula, Montana

                         Argued: March 31, 2023
                   Submitted: April 4, 2023
                    Decided: October 11, 2023

Filed:

                        _____
                                 Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 This matter comes before the Court on a Petition for Writ of Supervisory Control filed by Melissa Groo (Groo). Groo asks this Court to exercise supervisory control, pursuant to M. R. App. P. 14(3), over the Montana Eleventh Judicial District Court, and to conclude that the District Court's order of July 22, 2022, denying Groo's Motion to Dismiss, was in error.

¶2 The underlying case arises from Groo's purposeful and substantial use of social media to affect the business operations of Triple D Game Farm, Inc. (Triple D). In response, Triple D filed a Complaint and Demand for Jury Trial alleging Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage claims against Groo.

¶3 Groo moved to dismiss the claims against her for lack of personal jurisdiction. She contends that the statements she allegedly made on social media about Triple D did not create the minimum contacts with Montana as a forum nor constitute purposeful availment of the protections afforded by Montana law—both of which are required for a Montana court to exercise personal jurisdiction over an out-of-state defendant. The District Court held that the tort claims accrued in Montana because Groo's Facebook posts and messages identified Plaintiffs and tagged Montana residents and that bringing Groo before Montana courts would comport with the Fourteenth Amendment's Equal Protection Clause.

¶4 We accept supervisory control and restate the issue as follows:

*Does Montana have specific personal jurisdiction over Groo regarding Triple D's intentional tort claims when the tortious activity allegedly accrued in Montana despite Groo only interacting with the forum via social media?*

¶5 We conclude Montana has specific personal jurisdiction over Groo in this case and accordingly affirm the District Court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Around 1977, Triple D began operations as a wildlife photography farm in Flathead County, Montana. Lorney "Jay" Deist (Deist) and his spouse, Kimberly Deist, operate the business. Triple D uses Facebook to promote its business to its approximately 21,000 followers.

¶7 In 2011, Triple D hired Heather Keepers (Keepers) as an animal trainer. In July 2020, Keepers resigned for personal reasons. In August 2020, Keepers corresponded with a Triple D client, B.M., and recounted a story of poor animal welfare at the farm. Keepers then acted on B.M.'s suggestion that she contact Groo about the alleged maltreatment.

¶8 Groo is an expert in the field of ethics in wildlife photography. She has received numerous awards for her contributions to the field and has published manifold articles on the topic in popular outlets, such as *Outdoor Photographer*. Groo has openly, repeatedly, and vehemently criticized photography game farms in her articles. She is a citizen and resident of the State of New York. Her only physical connections to Montana in the last five years include four short-term trips to the state.

3

¶9    In August 2020, Keepers, while outside of Montana, used Facebook Messenger to contact Groo, who also was not physically present in the state.  Keepers sent the following message:

> Hello Melissa.  As I am not a big fan of yours, this message is difficult for me to send.  But someone mentioned your name yesterday when I filled them in in [sic] some information.  And I got to thinking.  While you and I are not friends, we do have a common enemy....for slightly different reasons, but also for many of the same.  Triple D.
>
> My time spent there was heaven and hell all wrapped in one.  I loved those animals more than anyone could love anything.  And I gave them the best I could with what I was provided with.  I worked there for 9 years under the false pretense that I would soon be taking it over.  I held onto that idea Bc I wanted to change so much of what it was.  And is.  Many things you are wrong about but many things you are right about.
>
> I will not disclose any information to you yet.  Other than I have ENDLESS information and evidence and knowledge of evidence of many things. Illegal, unethical, and just absolutely morally wrong and dishonest.
>
> My goal in reaching out to you is simple.  Those animals need to be "saved" from Jay Deist.  Those animals deserve so much better.  And especially now that I'm not there to provide half of what they deserve, a lot of them are now just sitting and rotting.  Some have even died suddenly since I left.  (I left July 9).  I am obviously desperate to save them.  And well....it'll take someone who hates the Triple D as much as I do to do that.  And I don't mean some animals and then Jay can get more. I mean ALL animals.  And his operation stops entirely.  Forever.
>
> Is this something that interests you?

¶10   Groo responded to Keepers less than an hour later.  Groo wrote:

> Absofuckinglutely.
>
> You are writing me at a very opportune time.  i would love to get your help on taking him down.  The things that I have uncovered from lots of research haunt me more than you can know.  Or maybe you can know.  I know we have clashed in the past, but if your first concern is the animals, we have that in common, and that is HUGE.  Let's try to collaborate to make a better future

4

for them.  I am incredibly grateful you reached out.  I know how terribly difficult it must be.

In advance of us speaking more, I want you to know that i am sorry if you feel attacked by me.  It's just that I was horrified by what I had learned about Jay Deist and the fate of many of the animals, and you were the very public face of Triple D.  So you got my anger.  I felt you were complicit.  But now I see you were not.  And that you really do care.  I'm sor [sic] sorry to have misjudged you.

I can't tell you how grateful I am to hear from you.  I have a very special opportunity for you to speak out and to help make a big change but I can't say more about it now.  Let's figure out how to move forward on this.  I am away from home right now, and short on time, but will be back home as of this weekend.

I seriously want to weep with gratitude.

I want very much for Triple D and all game farms to be done.  i am with you 200%.

¶11    About an hour later, Keepers responded:

Perfect.  Look forward to talking.

Disclaimer: my biggest hesitation is that I signed a nondisclosure agreement upon employment.    (Who  tf  has  animal  professionals  sign  a nondisclosure???)  Anyway. I'd lose every penny from here on out if it meant ridding him of any and all animals now and future.  But I'd rather not get sued.  I'm not sure the total legality of everything.  But I am working on understanding it.

¶12    Later, Groo emailed Keepers:

Heather, I was just doing some reading, and in advance of our talking, thought you might like to look over this info too:

When an NDA can be broken: [link to website]

Animal Welfare Act enforcement: [link to website]

For violations of Endangered Species Act (which might just apply to the leopards?) [link to website]

5

You are probably way ahead of me on this, but in case it's helpful!

I also wanted to mention that I am well connected to many kinds of folks we could seek out to help guide you. I know animal lawyers, am friends with Dan Ashe who was head of USFWS for years, I know a Montana FWP legal counsel, and am friends with the folks that lead captive wildlife programs at leading animal conservation and welfare orgs. So just know there is lots of support out there for you if you want it and I can help you connect to your choice.

M.

¶13 Following this initial exchange with Keepers, Groo used Facebook to share content pertaining to Triple D and to encourage other users to take explicit actions intended to affect Triple D. On August 6, 2020, Groo shared an article from Roadsidezoonews.org titled "Photography game farm Triple D Wildlife cited 6 times for keeping animals in squalor." Her post included the following comment: "More on Triple D photo game farm. What a disgrace to treat these magnificent animals so poorly. It's time for these wildlife brothels to be done. Photo by Susan Fox from a visit years ago to Triple D. Please share."

¶14 Importantly, between August 2–4, 2021, Groo again used Facebook to share information about Triple D and to direct users to take action that would affect Triple D's operations. In that three day period, Groo repeatedly shared a similar message—"I hope very much that those photographers/artists *and companies listed as holding regular or future workshops there* would cancel them immediately. It would be unconscionable to continue to support this facility"—and, within those messages, tagged various Triple D

6

clients and group leaders.[1]  (Emphasis added.)  Approximately one-quarter of the individuals and companies tagged by Groo were located in Montana.  Others tagged were not located in Montana, but had ongoing contracts with Triple D that were executed, and to be performed in, Montana.[2]

¶15    Triple D alleges that Groo's social media posts had a detrimental impact on their business in Montana.

¶16    On January 25, 2022, Triple D filed a Complaint and Demand for Jury Trial alleging Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage claims against Groo.

---

[1] "A tag is a special kind of link.  When you tag someone, you create a link to their timeline.  The post you tag the person in may also be added to that person's timeline.  For example, you can tag a photo to show who's in the photo or post a status update and say who you're with.  If you tag a friend in your status update, anyone who sees that update can click on your friend's name and go to their timeline.  Your status update may also show up on that friend's timeline." Tagging on Facebook, National Center of State Courts, https://perma.cc/7B3G-ZF8Y.  *See also Majumdar v. Fair*, 567 F. Supp. 3d 901, 911 (N.D. Ill. 2021) (stating that tagging someone is akin to sending them a public letter, which strengthens the argument that it is a substantial contact with the forum allowing personal jurisdiction).

[2] The Dissent emphasizes that we base our decision on only three tags of Montana residents posted to a national forum that also targeted residents of eight other states.  *See, e.g.*, Dissent, ¶ 68.

First of all, we do not decide today whether tagging three Montana residents would be enough for a tort to accrue within Montana when other states' residents are tagged that have no connection to Montana.  The Dissent mischaracterizes the rest of the tags when it says "there is simply no record evidence that any of the other persons tagged were actually doing business with Triple D." Dissent, ¶ 70.  The post itself belies this argument.  The post was targeted so that *every individual tagged* was either a Montana resident or one doing business in Montana with Triple D.  Other record evidence supports that each of these tags were directed to Montana residents or those doing business with Triple D.  The complaint alleges that Groo directly listed "client group leaders" in the posts, all of whom had contracts with Triple D.  The Deist affidavits similarly support this.

Further, as shown above in footnote one, the Dissent gets it wrong when it says only three Montanans were targeted.  *See* Dissent, ¶ 70.  Any Facebook friends of those residents also would have seen the post through that person's timeline.

7

¶17 On April 18, 2022, Groo filed a Motion to Dismiss pursuant to M. R. Civ. P. 12(b)(2) and 12(b)(6)—alleging lack of personal jurisdiction and failure to state a claim upon which relief can be granted, respectively.

¶18 On July 22, 2022, following oral argument, the District Court denied Groo's Motion to Dismiss in all respects. The court concluded that "Groo's social media campaign resulted in the accrual within Montana of Triple D's claims against her, and Montana's long-arm statute applies." The court also determined that Groo had the requisite minimum contacts with Montana and that the court's exercise of personal jurisdiction over Groo comported with due process.

¶19 On October 13, 2022, Groo filed a Petition for Writ of Supervisory Control with this Court. On December 22, 2022, we ordered additional briefing from the parties, and on March 31, 2023, conducted an oral argument.

**STANDARD OF REVIEW**

¶20 This Court has supervisory control over Montana courts. Mont. Const. art. VII, § 2(2); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 2019 MT 115, ¶ 5, 395 Mont. 478, 443 P.3d 407, *aff'd*, 141 S. Ct. 1017 (2021). Supervisory control is an extraordinary remedy that we exercise on a case-by-case basis. *Ford Motor Co.*, ¶ 5 (citing M. R. App. P. 14(3)). We will assume supervisory control over a district court to direct the course of litigation if the court is proceeding based on a mistake of law, which if uncorrected, would cause significant injustice for which appeal is an inadequate remedy. *Simms v. Mont. Eighteenth Jud. Dist. Ct.*, 2003 MT 89, ¶ 18, 315 Mont. 135, 68 P.3d 678.

¶21 This Court reviews a personal jurisdiction ruling de novo. *Tackett v. Duncan*, 2014 MT 253, ¶ 16, 376 Mont. 348, 334 P.3d 920. In considering the motion, all well-pleaded allegations in the complaint are taken as true and construed in the light most favorable to the plaintiff. *Meagher v. Butte-Silver Bow City-County*, 2007 MT 129, ¶ 13, 337 Mont. 339, 160 P.3d 552. Additionally, affidavits and other evidence may be considered in a motion to dismiss for lack of personal jurisdiction. *Jackson v. Kroll, Pomerantz & Cameron*, 223 Mont. 161, 165, 724 P.2d 717, 720 (1986).

## DISCUSSION

¶22 *Issue: Does Montana have specific personal jurisdiction over Groo regarding Triple D's intentional tort claims when the tortious activity allegedly accrued in Montana despite Groo only interacting with the forum via social media?*

¶23 A court may exercise personal jurisdiction over the parties in a proceeding pursuant to general (all-purpose) or specific (case-linked) personal jurisdiction. *DeLeon v. BNSF Ry. Co.*, 2018 MT 219, ¶ 7, 392 Mont. 446, 426 P.3d 1. Both parties agree that Groo is not subject to general personal jurisdiction in Montana. Whether the District Court can exercise personal jurisdiction over Groo hinges on the scope of specific personal jurisdiction.

¶24 Specific personal jurisdiction exists only where two elements have been satisfied. *Threlkeld v. Colorado,* 2000 MT 369, ¶ 9, 303 Mont. 432, 16 P.3d 359. First, the suit itself must arise from the specific circumstances set forth in Montana's long-arm statute, M. R. Civ. P. 4(b)(1). *Buckles v. Cont'l Res., Inc.*, 2017 MT 235, ¶ 15, 388 Mont. 517, 402 P.3d 1213. Second, if personal jurisdiction exists pursuant to Rule 4(b)(1), we then

9

determine whether exercising such jurisdiction would comport with traditional notions of fair play and substantial justice embodied in the Due Process Clause. *Threlkeld*, ¶ 9.

## Montana's Long-Arm Statute

¶25 The District Court concluded that the first element was satisfied under Rule 4(b)(1)(B), which states that any person is subject to the jurisdiction of Montana courts as to any claim for relief arising from "the commission of any act resulting in accrual within Montana of a tort action." M. R. Civ. P. 4(b)(1)(B). The court determined that Triple D made a "sufficient showing" that Groo's social media campaign resulted in the accrual of the alleged tort actions in Montana.

¶26 This Court's analysis of accrual has focused on where the events giving rise to the claims occurred, rather than where the plaintiffs allegedly experienced or learned of their injuries. *Tackett*, ¶ 31.

¶27 For example, we concluded in *Bi-Lo* that a claim did not accrue in Montana based on the following reasoning:

> Bi-Lo sent its check to Alpine in Colorado. Alpine deposited the check into the account of one of its customers in Colorado. Alpine's alleged mishandling of the check occurred in Colorado. Accordingly, Alpine's activities did not result in the accrual of a tort action in Montana.

*Bi-Lo Foods, Inc. v. Alpine Bank*, 1998 MT 40, ¶ 31, 287 Mont. 367, 955 P.2d 154.

¶28 Likewise, in *Bird v. Hiller*, 270 Mont. 467, 892 P.2d 931 (1995), this Court determined that claims of fraud, deceit, and conversion related to a dispute over attorney fees arising from defendant attorney's representation of the plaintiff accrued in Idaho because that was where the plaintiff traveled to seek out the defendant's services and where

10

the defendant made the contested representations. *Bird*, 270 Mont. at 473, 892 P.2d at 934. Though the defendant had sent a fee agreement and other letters to the plaintiff's Montana address, we held that jurisdiction is not acquired through interstate communications solely by signing a contract to be performed in another state. *Bird*, 270 Mont. at 473, 892 P.2d at 934.[3]

¶29 Further, in *Cimmaron Corp. v. Smith*, 2003 MT 73, 315 Mont. 1, 67 P.3d 258, Cimmaron (a Montana corporation) entered into a collection agreement with Budget Reader's Service (a Pennsylvania corporation owned by Pennsylvania resident Gregory Smith (Smith)) and a sales agreement with Smith's father, Harold Smith (a Florida resident). Thereafter, Cimmaron filed suit against Budget and the Smiths in a Montana district court asserting various claims, including conversion of funds and misappropriation of assets. *Cimmaron*, ¶¶ 4, 6, 17. Cimmaron conceded that the defendants' actions giving rise to those claims occurred outside Montana; however, Cimmaron argued that because it was detrimentally affected within Montana by the defendants' actions, such actions resulted in the accrual of a tort action within Montana. *Cimmaron*, ¶ 17.

¶30 This Court disagreed with Cimmaron. We stated that "interstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot *by*

---

[3] In the context of claims for breach of contract, *see Milky Whey, Inc. v. Dairy Partners, LLC*, 2015 MT 18, 378 Mont. 75, 342 P.3d 13.

The Dissent contends that *Milky Whey* stands for its proposition. Dissent, ¶ 78. However, *Milky Whey* discussed that "[a] tort action arises from a duty imposed by operation of law" that exists in the absence of a contract—such as the duty to not tortiously interfere with contractual or prospective business relations. *Milky Whey*, ¶ 23. When a defendant violates a legal duty by directing messages into Montana that constitute and cause the full tort in and of themselves, they can reasonably expect to be haled into Montana courts.

*itself* be considered a contact for justifying the exercise of personal jurisdiction." *Cimmaron*, ¶ 14 (internal quotation and citation omitted) (emphasis added). We held that the actions that gave rise to the alleged torts occurred outside Montana because the defendants came into possession of, and allegedly misappropriated, Cimmaron's accounts receivable in another state. *Cimmaron*, ¶ 20.

¶31 Finally, in *Ford Motor Co.*, we concluded that the design defect, failure to warn, and negligence actions accrued in Montana because "Gullett was driving the Explorer in Montana when the accident occurred"—even though Ford had manufactured and sold the vehicle in another state. *Ford Motor Co.*, ¶ 11.

¶32 This Court's case law makes clear that whether a tort accrued in Montana is highly-fact specific and dependent on the nature of the alleged tort at issue. Here, the "act" at issue is Groo's targeted social media campaign towards a Montana business, Montana residents, and those with contracts in Montana (a Montana audience), which was calculated to result in actual damage or loss to Triple D. To prevail on its claims of tortious interference with prospective economic advantage and tortious interference with contractual relations, Triple D will still need to prove: "(1) an intentional and willful act; (2) calculated to cause damage to the plaintiff's business; (3) with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and, (4) the act results in actual damage or loss." *Wingfield v. Dep't of Pub. Health and Hum. Servs.*, 2020 MT 120, ¶ 8, 400 Mont. 70, 463 P.3d 452. The Dissent claims that we are only focusing on Triple D's harm within Montana to establish accrual within Montana; in fact, it is not the harm *by itself* that accrued within Montana, but also Groo's social media

12

campaign targeted *solely* towards Montana residents and businesses with contractual relations in Montana.

¶33 Further, Triple D alleges that Groo's social media campaign targeted people and businesses it had (and lost) contracts with, which were executed and performed only in Montana. By executing and performing contracts within Montana, even if they were executed over the phone or otherwise, Triple D's clients were availing themselves of Montana law and jurisdiction. *See Spectrum Pool Prods., Inc. v. MW Golden, Inc.*, 1998 MT 283, 291 Mont. 439, 968 P.2d 728. By allegedly (1) intentionally targeting Montana contracts and residents, (2) to cause damage to Triple D, (3) with the unlawful purpose of causing damage to Triple D, and (4) actually damaging Triple D, Groo committed an act that accrued within Montana. M. R. Civ. P. 4(b)(1)(B). The damage being felt in Montana is not what accrues the tort in Montana, by itself, but also Groo's conduct intentionally aimed into Montana and to a Montana audience.

¶34 Contrary to the Dissent's assertion in ¶ 72, someone reviewing a business or sharing about their boycott on a national platform would not be subject to personal jurisdiction in the plaintiff's forum state. Indeed, if Groo had stopped her online activities after posting the article referred to in ¶ 13 of this Opinion (or even continued posting articles like this directed to a national audience) she would not be subject to personal jurisdiction in Montana today. The post that tipped the scales and subjected her to personal jurisdiction in Montana was that recounted in ¶ 14 of this Opinion. This post is unique from an online review of a business or product in that (1) it was not directed to a national audience, but solely directed into Montana towards Montana residents and those doing business in

13

Montana with Triple D, (2) it encouraged a Montana audience not to do business with Triple D, and (3) it created by itself, in a Montana resident, a potential cause of action within Montana for an intentional tort. Groo directed her online activity solely towards a Montana audience by researching and tagging only those in Montana or those in business with Triple D in Montana. This is highly distinguishable from a simple review posted online for anyone to see, which is not targeted toward one particular state or audience. *See, e.g.*, ¶¶ 56–59 of this Opinion (discussing cases where a person posting on a generally accessible website not directed to any particular audience in a state did not support exercising specific personal jurisdiction). For distinguishable cases, *see* ¶¶ 53–55 of this Opinion. Each case is highly fact dependent, and we do not today opine on a hypothetical situation that is not factually developed or before us.

¶35 Groo relies on distinguishable cases for the rule that for specific personal jurisdiction to lie under Rule 4(b)(1)(B), the defendant must have taken some action while physically present in Montana that leads to the accrual of the tort. She cites *Tackett* in support of this supposed rule based on our holding that "the transmission into Montana of material statements that the defendant allegedly knows are false or fraudulent is insufficient *by itself* to establish accrual of a fraud or deceit action in Montana." *Tackett*, ¶ 35 (emphasis added).

¶36 In *Tackett*, we concluded that Florida defendants formed no jurisdictionally relevant contacts with Montana. In that case, all but one of the events related to the plaintiff's claims took place in Florida. The plaintiff's single act of permitting his local bank in Montana to transfer funds to a Florida corporation was insufficient to establish that his tort

14

action accrued in Montana pursuant to Rule 4(b)(1)(B). *See generally Tackett*. However, the only act which had any relation to Montana was done by the plaintiff; the defendant made no contacts with Montana. In *Tackett*, unlike here, the defendants' transmission of materially false statements into Montana did not constitute the full tort in and of itself. Rather, it was the defendants' additional acts in Florida that accrued plaintiff's fraud and deceit claims. Here, Triple D alleges, and we take as true, that the post itself, which was directed to a Montana audience, constituted the full tort at issue.

¶37    The Dissent quotes *Tackett* and other cases (further discussed below) and suggests the only way to gain personal jurisdiction is if the defendant was in Montana when the events giving rise to the tort occurred. *See* Dissent, ¶ 77. However, as these cases show, the proper analysis is what the defendant's actions were, and whether those acts led to events that gave rise to tort claims in Montana.

¶38    For example, in *Tackett*, the defendant did not act at all with respect to Montana, only the plaintiff did. *See Tackett*, ¶¶ 7-12, 15, 34 ("No part of Defendants' course of conduct forming the basis of [Plaintiff's] claims occurred in Montana. Defendants never . . . sent anything or anyone to Montana."). Similarly, in *Bi-Lo*, only the plaintiff had contact with Montana—the defendant took no action towards Montana, but instead received a check from the plaintiff in Montana and deposited it in Colorado. *See Bi-Lo*, ¶¶ 5–6. In *Bird*, although the defendant had sent communications into Montana, the alleged tort did not accrue from the communications like they did here, but rather accrued where the defendant committed "'a distinct act of dominion'" over the money—in Idaho. *Bird*, 270 Mont. at 472, 892 P.2d at 934 (quoting *Gebhardt v. D.A. Davidson & Co.*,

15

203 Mont. 384, 389, 661 P.2d 855, 858 (1983)). In *Threlkeld*, defendants had had phone calls with plaintiffs in Montana, but those contacts were not initiated by defendants, nor did the tort accrue through those contacts, which accrued only when the horse was treated and died in Colorado. *See Threlkeld*, ¶¶ 28, 32. The torts in *Cimmaron* similarly accrued when the defendants allegedly misappropriated funds in Pennsylvania. *See Cimmaron*, ¶¶ 4, 17.

¶39 True, interstate communication which reaches Montana, *by itself*, is not enough for a tort to accrue within Montana. *See, e.g.*, *Cimmaron*, ¶ 14; *Tackett*, ¶ 35. However, that is not the instant case. Here, Groo allegedly directed messages into Montana, to Montana residents and businesses, and to residents of other states doing business in Montana with Triple D; intentionally and unlawfully intending those messages to interfere with Montana contracts and potential business; and caused damage to a Montana business by advocating for others to take action within Montana. This is not merely interstate communication, or merely a harm accruing within Montana, but a targeted campaign into Montana and towards a Montana audience.

¶40 Defendants, like Groo, cannot hide behind state lines, intentionally acting into Montana in such a way to cause torts to accrue in Montana, and not expect to be subject to Montana courts by virtue of M. R. Civ. P. 4(b)(1)(B). Otherwise, defendants could escape the reach of Montana courts despite having caused the event within Montana at the heart of torts related to economic interference—namely, the disruption of current and prospective business. This interpretation, as will be discussed further below, would

16

significantly hinder the State of Montana's ability to protect the interests and rights of its residents.

¶41 Because the events that gave rise to Triple D's allegations of Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage could not have accrued in any state other than Montana based on the nature of Triple D's business, we conclude that the suit itself arises from the specific circumstances set forth in Montana's long-arm statute, M. R. Civ. P. 4(b)(1)(B).

### Due Process

¶42 The District Court concluded that the second element for a court's constitutional exercise of specific personal jurisdiction was satisfied given the nature and substance of Groo's forum-related activities. This limitation on a Montana court's exercise of personal jurisdiction results from the Fourteenth Amendment's Due Process Clause. U.S. Const. amend. XIV. To determine if exercising personal jurisdiction over a defendant comports with due process, a court must consider whether: "(1) the nonresident defendant purposefully availed itself of the privilege of conducting activities in Montana, thereby invoking Montana's laws; (2) the plaintiff's claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of personal jurisdiction is reasonable." *Ford Motor Co.*, ¶ 12 (citing *Simmons v. State*, 206 Mont. 264, 276, 670 P.2d 1372, 1378 (1983)).

¶43 With respect to the first prong, the District Court reasoned that Groo purposefully availed herself of the benefits and protections of the laws of Montana by taking voluntary action designed to have an effect in Montana. *See Simmons Oil Corp. v. Holly Corp.*,

17

244 Mont. 75, 86, 796 P.2d 189, 195 (1990) (defining purposeful availment as a defendant taking voluntary action "designed to have an effect in the forum"). More specifically, Groo identified and targeted a Montana audience and had the specific intent of inflicting economic pain on a Montana business. We agree that Groo's actions satisfied this first prong.

¶44 On the second prong, the District Court determined there is no question Groo's social media campaign constituted forum-related activities that gave rise to Triple D's claims. The court again stressed that Groo tailored her actions to have an effect on Montana residents and a Montana business. According to the court, there was a nexus between the content of Groo's campaign and Triple D's business—that nexus made it reasonably foreseeable to Groo that her campaign would reach Montana and have an impact in Montana. We agree that Groo's actions satisfied this prong.

¶45 On the third prong, the District Court applied the presumption of reasonableness set forth by this Court in *Ford Motor Co.* to evaluate whether Groo presented a compelling case that exercising jurisdiction would be unreasonable. *Ford Motor Co.*, ¶¶ 12, 28. The court then evaluated Groo's case based on seven factors identified by the *Ford Motor Co.* Court. *Ford Motor Co.*, ¶ 29.[4] The court acknowledged that Groo would face some hardship in having to defend in Montana, but found that the other factors tend toward

---

[4] The reasonable analysis turns on factors related to fundamental fairness, including, but not limited to: (1) the extent of the defendant's purposeful interjection into Montana; (2) the burden on the defendant of defending in Montana; (3) the extent of conflict with the sovereignty of the defendant's state; (4) Montana's interest in adjudicating the dispute; (5) the most efficient resolution of the controversy; (6) the importance of Montana to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

jurisdiction being reasonable: Groo engaged in intentional conduct designed to have a targeted impact in Montana; Montana exercising jurisdiction would not conflict with the sovereignty of the State of New York; Montana has an interest in adjudicating the disputes affecting its residents and businesses; Montana would be the most efficient forum for resolving the controversy; Montana is important to Triple D's convenient and effective relief; and, New York would not serve as a valid alternative forum. Based on that evaluation, the court concluded that Groo failed to make a compelling case that exercising jurisdiction would be unreasonable. We agree.

¶46 Following the United States Supreme Court's ruling in *Walden v. Fiore*, 571 U.S. 277, 134 S. Ct. 1115 (2014), this Court has also analyzed a court's exercise of specific jurisdiction within the context of a tort action under two overlapping lines of inquiry. *Tackett*, ¶ 32. First, whether the relationship among the defendant, the forum, and the litigation arises out of contacts that the defendant created with the forum state. *See Tackett*, ¶ 32 (citing *Walden*, 571 U.S. at 284, 134 S. Ct. at 1122). And, second, whether the plaintiff is the only link between the defendant and the forum or whether the defendant's conduct forms the connection with the forum state that is the basis for jurisdiction over them. *See Tackett*, ¶ 33 ("A defendant must be haled into court in a forum state 'based on his own affiliation with' the state, not based on the unilateral activity of a plaintiff or on the random, fortuitous, or attenuated contacts the defendant has with other persons affiliated with the state." (quoting *Walden*, 571 U.S. at 286, 134 S. Ct. at 1123)).

¶47 In *Walden*, the United States Supreme Court held that a law enforcement agent who filed a false affidavit in Georgia did not create contacts with the forum state, Nevada, where

19

the individuals affected by that affidavit resided. *See Walden*, 571 U.S. at 288, 134 S. Ct. at 1124 ("Petitioner never . . . contacted anyone in, or sent anything . . . to Nevada."). Absent the unilateral activity of the plaintiffs, the agent would have made no contact with the forum state. *Walden*, 571 U.S. at 291, 134 S. Ct. at 1126.

¶48    Here, unlike in *Walden*, Groo created the contacts that established a relationship between herself, the forum, and the litigation. As alleged, Groo repeatedly, intentionally, and with the aim of causing certain actions in Montana used social media to contact known and prospective clients of a Montana-based business and its Montana-based operator. In short, Groo established her own affiliation with the state. She identified other residents of Montana and those with business relations in Montana; the *Walden* agent made no such intentional outreach to residents of Nevada other than the plaintiffs. She tailored messages to influence those residents; the *Walden* agent only took actions intended to exclusively affect the plaintiffs. And, she aspired to steer those residents away from a Montana business; the *Walden* agent did not intend to interfere with economic affairs protected by and reliant upon the enforcement of the laws of Nevada.

¶49    How trying to "Absofuckinglutely" take down a Montana business is not a contact with the forum state itself is a difficult question to answer. These economic losses were not the result of a "random, fortuitous, or attenuated," *Walden*, 571 U.S. at 286, 134 S. Ct. at 1123, contact that had an incidental effect of causing someone to renege on a contract— such as might happen when someone reads one of Groo's stories about photographing captive wildlife and decides they no longer want to take part. *See, e.g.*, Melissa Groo, *How*

20

*to Photograph Wildlife Ethically*, Nat'l Geographic (July 31, 2019), https://perma.cc/4FGN-HH8N.

¶50 We applied the *Walden* inquiry in *Tackett* and concluded that the defendant's sole connection to Montana was one the plaintiff had created and that an injury to the plaintiff in Montana was an insufficient connection to the forum. *Tackett*, ¶¶ 34-35. In that case, like in *Walden*, the defendants "never traveled to, conducted activities within, or sent anything or anyone to Montana." *Tackett*, ¶ 34. Additionally, the events that gave rise to the claims at issue in *Tackett* did not accrue in Montana, notwithstanding the Montana-based plaintiff having experienced harm in Montana as a result of those events. *Tackett*, ¶ 35.

¶51 Here, Groo was not a passive defendant like the ones in *Walden* and *Tackett*. She initiated a social media campaign that solely included Montana residents and those doing business in Montana, and that targeted a Montana business. As alleged, she tagged companies and individuals in Montana and urged them not to engage with Triple D's Montana-based business. Likewise, as previously discussed, the events that gave rise to the claims at issue accrued in Montana. It follows that Groo made several and substantial "jurisdictionally relevant contacts" with Montana. *Cf. Walden*, 571 U.S. at 288, 134 S. Ct. at 1124.

¶52 The exercise of specific personal jurisdiction over Groo in this matter comports with M. R. Civ. P. 4(b)(1)(B) and due process. An alternative conclusion would greatly diminish the ability of states to protect the interests of their residents in the digital era. Groo's emphasis on the need for physical contact with a forum for that forum's courts to

21

exercise specific personal jurisdiction harkens back to an era before the Internet and even before interstate transit.  Though the United States Supreme Court has not decided a case directly addressing the limits imposed by the Due Process Clause when personal jurisdiction is premised on a defendant's online conduct, Groo offers no case law that due process serves to protect out-of-state actors who intentionally target and aim to cause harm in a specific forum.

¶53    Other courts that have considered exercising specific personal jurisdiction over defendants due to their social media posts have reached a similar conclusion.  For example, in *Zehia v. Superior Court*, the Court of Appeals of California, Fourth Appellate District, Division One considered "whether California may exercise specific personal jurisdiction over a nonresident defendant who sent allegedly defamatory statements to California residents through private online social media messages with the aim of interfering with the residents' personal relationships."  45 Cal. App. 5th 543, 546–47 (Cal. Ct. App. 2020).  The court found personal jurisdiction was appropriate for three reasons.

¶54    First, the defendant "transmitted the allegedly harassing statements directly to a California resident (the plaintiff) and the allegedly fabricated conversations directly to another California resident . . . with knowledge the recipients were California residents."  *Zehia*, 45 Cal. App. 5th at 556; *see also O'Keefe v. Rustic Ravines, LLC*, 2023 U.S. Dist. LEXIS 3913 at *9 (W.D. Pa.) (distinguishing the use of passive websites from using tools available on social media platforms such as Facebook to target specific users with a specific interest or within a particular geographic location); *cf. Luster v. Reed*, 2022 U.S. Dist. LEXIS 149665 at *16 (W.D. Pa.) (concluding plaintiff had failed to set forth facts that the

22

defendant intentionally aimed tortious conduct towards the forum state and the "social media posts purportedly made by Defendant . . . lack[ed] any nexus" to the forum).

¶55    Second, the nature and harm of the alleged tort connected the defendant to the forum. *Zehia*, 45 Cal. App. 5th at 557. And third, the alleged tortious behavior had a "distinct California focus" because "defamatory content with a forum-related focus strengthens the connection between a nonresident tortfeasor's conduct and the forum." *Zehia*, 45 Cal. App. 5th at 557-58; *see also, e.g.*, *Postacchini v. Liljestrom*, 2023 Cal. Super. LEXIS 23035 at *7 (collecting cases in which California state courts have held that "websites or social media posts may establish purposeful availment for personal jurisdiction over a non-resident."); *Majumdar*, 567 F. Supp. 3d at 911 ("The fact that a Twitter mention or Facebook tag is a means of addressing a public rather than private communication to a particular user does not make it any less an intentional, direct contact."); *Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 850 (E.D. Mich. 2019) (asserting personal jurisdiction over a nonresident defendant who "doxed" plaintiff); *Lord v. Smith*, 2022 U.S. Dist. LEXIS 225098 (N.D. Ill. 2022) (same).

¶56    The Dissent cites other jurisdictions' cases for its conclusion that purposefully directed internet postings can never hale a defendant into another state's courts. *See* Dissent, ¶ 84. Those cases do not stand for that proposition. In *Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011), the Tenth Circuit stated that "posting allegedly defamatory comments or information on an internet site does not, *without more*, subject the poster to personal jurisdiction wherever the posting could be read." *Shrader*, 633 F.3d at 1241

(emphasis added); *see also* Dissent, ¶ 84. We agree. *See, e.g., Cimmaron*, ¶ 14 ("by itself"); *Tackett*, ¶ 35 (same).

¶57 Nevertheless, this is not that case. Here, we do have the "more" called for in *Shrader*: (1) Groo directed electronic activity into the state by tagging Montana residents and those doing business in Montana; (2) with the manifested intent of engaging in interactions within the state by encouraging those tagged to not do business with Triple D; and (3) that activity created, in a person within Montana, a potential cause of action cognizable in Montana. *See Shrader*, 633 F.3d at 1240 (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002)) (laying out a test for when specific personal jurisdiction is proper arising out of a person's internet activity). Indeed, *Shrader* is notable for its distinction between two defendants—one of whom would have been subject to personal jurisdiction had the defendant directed the email at someone in Oklahoma, as here. *Compare Shrader*, 633 F.3d at 1244-46 (concluding no specific personal jurisdiction for defendant who merely posted information on website accessible everywhere), *with Shrader*, 633 F.3d at 1247-48 (concluding there would have been specific personal jurisdiction for defendant who sent email if he had knowingly directed the email at someone in Oklahoma).

¶58 Many of the Dissent's other citations are the same. *See Johnson v. Arden*, 614 F.3d 785, 795 (8th Cir. 2010) (merely posting on a generally accessible website not directed at Missouri is not enough to confer personal jurisdiction); *Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021) (posting on the internet without directing any communications to plaintiffs or "anyone else in Kentucky" insufficient to confer personal

24

jurisdiction); *see also Revell v. Lidov*, 317 F.3d 467, 473-75 (5th Cir. 2002) (same); *Young v. New Haven Advocate*, 315 F.3d 256, 263 ( 4th Cir. 2002) (same).

¶59 Similarly, the Dissent points to *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017), where, although an email list had 10 California residents, the defendant did not expressly aim its intentional act into California. *See* Dissent, ¶ 84. The case now before us, however, is more akin to a more recent Ninth Circuit decision, *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021), where an Australian skincare company directed social media advertisements to America, and therefore subjected itself to personal jurisdiction in California for trademark infringement resulting from the advertisements.

¶60 The general rule from the Dissent's cases is clear—and we agree—simply posting information on the internet for anyone to see is not enough *by itself* to establish personal jurisdiction over a defendant. However, when a defendant engages in a targeted campaign against a Montana business, tags Montana residents and those doing business in Montana, and encourages them to refrain from doing or continuing actions in Montana, that person has purposefully directed conduct into Montana such that the Due Process Clause allows them to be haled into Montana courts.

¶61 This Opinion, like *Zehia*, reflects the fact that the ease with which a nonresident can use social media to intentionally and substantially interfere with a resident's interests and rights is not a barrier to a forum's exercise of specific personal jurisdiction.

¶62 The Complaint alleges that Groo stated an intent to destroy a Montana business. She acted on that intent with a targeted social media campaign. And—though she acted on

25

that intent with minimal effort—she nevertheless attempted to rally Montanans and others to undermine a Montana business.

## CONCLUSION

¶63 Groo petitioned this Court for supervisory control on the basis that the District Court was proceeding based on a mistake of law, thereby causing a substantial injustice for which she has an inadequate remedy on appeal. M. R. App. P. 14(3). We conclude the District Court is not proceeding under a mistake of law and agree that it has personal jurisdiction to resolve this dispute.

¶64 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice Laurie McKinnon, dissenting.

¶65 I dissent.

¶66 The Due Process Clause of the Fourteenth Amendment and Montana's long-arm statute protect nonresident defendants from being haled into a state court and bound by its judgments when they have no connection whatsoever to the forum state, regardless of what they have said about a resident plaintiff. Groo may have targeted Triple D, but she has no relationship to Montana and she did not target the State of Montana. This case can be

26

resolved by applying—correctly and carefully—Montana's long-arm statute and precedent. Triple D's tort claims are based on communications occurring outside Montana between nonresident individuals on a national forum specific to the wildlife photography industry. This Court has held other more specific mediums of communication—telephone, fax, emails, letters—which directly targeted a Montana resident were insufficient to exercise personal jurisdiction. Groo's three "tags" on a public social media present an even less compelling case for exercising personal jurisdiction. I would conclude that the torts pled by Triple D do not arise from the type of conduct enumerated in Montana's long-arm statute. However, even if they did, I would conclude that exercising jurisdiction over Groo does not comport with due process.

A.    Record Facts.

¶67    Preliminarily, some discussion of the particular out-of-state communications is important. As the Court notes, the first communication occurred in August 2020, when Keepers sent Groo a private Facebook message about her concerns with Triple D. Groo responded with a private message that she was interested in helping Keepers and sent Keepers links to publicly available information regarding nondisclosure agreements. These were private messages not posted publicly, not sent to or from a Montana resident, not sent from Montana, and not sent to anyone that had contact with Triple D.

¶68    Next, Groo posted a comment on a Facebook post by Keepers. Keepers' post concerned an inspection report of Triple D's facility. At the time, Keepers was not a resident of Montana and Groo's comment made no mention of Montana and was not directed at Montana residents. Groo also reposted a story from Roadsidezoonews.org that

27

described how Triple D had been cited 6 times for keeping their animals in squalor. While mentioning Triple D, Groo's post did not mention Montana and was not targeted to Montana residents.

¶69 Finally, Groo posted once on Facebook: "I hope very much that those photographers and companies listed as holding future workshops there would cancel them immediately. It would be unconscionable to continue to support this facility." An edit history of this comment shows that Groo tagged individuals in the wildlife photography industry from Utah, California, Idaho, Tennessee, North Carolina, Virginia, Canada, Florida, and Montana. Three of the tags went to Montana residents. There is no record that these three residents ever read the post that Groo tagged.

¶70 Thus, based on these record facts, the only purported connection Groo had to Montana were the three tags to Montana residents attached to her Facebook post. The conduct forming the basis of Triple D's alleged torts all occurred outside of Montana, between nonresident individuals, and was not targeted to the State of Montana as a forum. Groo is free to lodge a social media campaign against anyone and anything she chooses, and she may be held accountable for her actions in a state whose long-arm statute includes such conduct and under circumstances demonstrating she has minimum contacts with the state. However, that Groo disparaged Triple D, a Montana resident, cannot—*by itself*— serve as the basis for exercising personal jurisdiction, unless the campaign was directed at the State of Montana and a Montana audience.[1] The Court's attempt to recast the facts to

---

[1] An example of a media campaign targeting a Montana audience and demonstrating a connection to the State of Montana would be a nonresident defendant sending out communications targeting

28

suit its outcome by making an argument that Groo has targeted a Montana resident by using three Facebook tags, is a distortion of both federal precedent and this Court's, which collectively hold that (1) suffering damages in Montana is not, by itself, sufficient to confer jurisdiction under the accrual section of Montana's long-arm statute, and (2) three Facebook tags to Montana residents do not constitute sufficient "minimum contacts" which comport with due process.

¶71 Importantly, the record simply does not support the Court's conclusion that "[a]pproximately one-quarter of the individuals and companies tagged by Groo were located in Montana." Opinion, ¶ 14. Groo's edit history from her Facebook account clearly demonstrates that her tags were sent to only three people who resided in Montana: Barbara Eddy, Julie Chapman, and Bar W Guest Ranch—a total of three tags. Further, and contrary to the Court's repeated focus on Triple D being "targeted," there is simply no record evidence that any of the other persons tagged were actually doing business with Triple D. In its clear and obvious objection to having a Montana resident "targeted," the Court fails to focus on the appropriate inquiry as set forth in Montana and federal precedent. The question is not whether Groo targeted a specific Montana resident through her media campaign; rather, it is whether three tags on a social media post demonstrates she purposely availed herself of the privilege of conducting activities within Montana, thus invoking the benefits and protections of Montana law which assures she will not be haled into Montana

_____

Montana for the purpose of influencing a Montana election. These out-of-state communications target the State of Montana and Montana voters and, by doing so, establish the necessary minimum contacts with the forum State of Montana.

29

solely because of random, fortuitous, or attenuated contacts. The Court obfuscates these fundamental considerations, indeed distinctions, underlying a personal jurisdiction and due process inquiry and instead focuses its inquiry on the fact that a Montana business has alleged it suffered injuries in Montana from acts occurring outside of Montana. However, being attacked by acts and conduct occurring outside the state cannot alone serve as a basis to hale that person into Montana courts. The Court's error is a fundamental distortion of our carefully drawn and clear precedent interpreting the accrual section of Montana's long-arm statute and of due process principles enunciated by the Supreme Court in *Walden*.

**B.      Montana's Long-arm Statute.**

¶72      Before addressing principles of due process, which I have already briefly touched upon in setting forth the record facts, Montana's long-arm statute must be considered. The cause of action must arise from the type of activity enumerated in Montana's long-arm statute as a first step to establishing personal jurisdiction. A defendant is not subject to personal jurisdiction in Montana if her alleged conduct falls outside one of the enumerated categories, regardless of whether federal due process might otherwise be satisfied. Here, Triple D invokes only one provision of the Montana long-arm statute, arguing that its causes of action "accrued" in Montana. Thus, the relevant section of M. R. Civ. P. 4(b)(1)(B), provides "any person is subject to the jurisdiction of Montana courts as to any claim for relief arising from the doing personally, or through an employee or agent, of any of the following acts: . . . (B) the commission of any act resulting in accrual within Montana of a tort action." As the communications constituting the basis of the tort were not aimed at a Montana audience and occurred outside of Montana between nonresidents, Triple D

argues the requirements of Montana's long-arm statute were satisfied because the communications "reached into Montana" and the tort "accrued" in Montana because it suffered economic hardship in Montana. The Court has failed to articulate its basis for determining Montana's long-arm statute has been satisfied other than holding that Groo's social media campaign affected a Montana business. Here, while the injury occurred in Montana, the conduct giving rise to the causes of action occurred outside of Montana among nonresidents. This Court, until now, has been clear that suffering an injury in Montana from out-of-state conduct does not meet the requirements of Montana's long-arm statute under M. R. Civ. P. 4(b)(1)(B).

¶73 While the Court refers to several relevant cases and attempts to distinguish them, the Court remains unenlightened by their holdings. The internet by itself allows the allegedly tortious communication to be viewed anywhere. This does not mean that the tort was committed everywhere. The Court's conclusion that a social media campaign targeting a resident is sufficient to invoke jurisdiction would make the requirements for exercising personal jurisdiction meaningless, not to mention invite the unreasonable consequence of having personal jurisdiction exist based on three social media tags when it would not exist for other more direct and specific forms of contact. The Court's analysis would mean that anyone who posted over the internet a "review" of a business, entity, or product could be haled into the plaintiff's forum court based entirely on the act of having posted a review. A review on the internet directly targets an entity or product and, under the Court's analysis, would provide a basis for exercising personal jurisdiction. Thus, for example, anyone who joins or posts advocating a boycott of a company or product, posts a

31

negative review on Amazon, or suggests people should not buy Bud Light[2] are subject to personal jurisdiction and could be sued in the plaintiff's forum court. The problem is the Court has gutted the requirements undergirding personal jurisdiction, with the result that any "reviewer" or "boycotter" is subject to jurisdiction everywhere—because the internet is everywhere.

¶74    Our precedent does not support the Court's conclusion that Triple D's alleged economic torts accrued in Montana.[3] In *Bird*, the Birds, who were Montana residents, were involved in an automobile accident in Idaho. They hired an Idaho attorney who sent a contingency fee agreement which was signed in Montana. When a disagreement arose with their Idaho counsel, the Birds filed suit in Montana alleging claims of fraud, deceit, and conversion. The Birds maintained that these claims accrued in Montana because that is where the Idaho attorney sent documents to sign and where the original fee agreement was signed. We concluded, however, that the Idaho attorney sending these documents into Montana did not result in the accrual of the claims here and did not establish a sufficient connection between the nonresident defendant and Montana. We held that the conduct underlying the fraud, deceit, and conversion claims all accrued in Idaho because that is where the Idaho attorney allegedly asserted unauthorized control. We held that the

---

[2] In April 2023, Bud Light was featured in a social media promotion by transgender influencer, Dylan Mulvaney. There were numerous requests over social media to boycott Bud Light and Anheuser-Busch suffered monetary losses to its North American revenue.

[3] The Court misses the mark when it construes my dissent interpreting our precedent as providing "the only way to gain personal jurisdiction is if the defendant was in Montana when the events giving rise to the tort occurred." Opinion, ¶ 37. What our precedent clearly establishes is that there is no personal jurisdiction over torts where the act giving rise to the claims did not occur in Montana and the fact that an injury was suffered in Montana is insufficient to confer jurisdiction.

representations occurred in Idaho and that although documents were sent to Montana residents, "jurisdiction is not acquired through interstate communications pursuant to a contract to be performed in another state." *Bird*, 270 Mont. at 473, 892 P.2d at 934. If legal documents sent to a Montana resident and executed in Montana is insufficient to confer Montana jurisdiction, then certainly three Montana Facebook tags which are part of a national forum specific to wildlife photography is, likewise, insufficient.

¶75     In *Bi-Lo*, Bi-Lo Foods, a Montana corporation, entered into negotiations with a Colorado company for the purchase of refrigeration equipment. The Colorado company instructed Bi-Lo to deposit earnest money into an escrow account at Alpine Bank, a Colorado corporation. Bi-Lo made the deposit but thereafter negotiations broke down and Bi-Lo demanded the escrow money be returned. Bi-Lo filed suit in Montana arguing that its claims accrued in Montana because, "by cashing its check and disbursing the funds to [the Colorado company], Alpine [Bank] took voluntary actions which were calculated to have an effect in Montana, did cause injury in Montana to a Montana resident, and should have caused Alpine to reasonably anticipate being haled into court in Montana." *Bi-Lo*, ¶ 21. These are the same arguments Triple D makes today. However, we rejected Alpine's argument that because the injury occurred in Montana there was personal jurisdiction under our long-arm statute, concluding instead that all acts giving rise to Bi-Lo's claims occurred in Colorado and, "[a]ccordingly, Alpine's activities did not result in the accrual of a tort action in Montana." *Bi-Lo*, ¶¶ 27, 31. Here, as well, only the injury suffered by Triple D occurred in Montana—all acts giving rise to the torts occurred outside of Montana between nonresidents.

33

¶76    In *Threlkeld*, the Threlkelds raised and bred horses in Montana.  After one of the horses became ill, the Threlkelds contacted Colorado State University's Veterinary Teaching Hospital and were given a recommended course of treatment and assured that the Hospital could provide such treatment.  Upon this assurance, the Threlkelds took their horse to the University for treatment.  The horse died the day after it was admitted to the hospital.  The Threlkelds filed suit in Montana alleging deceit, negligent misrepresentation or fraud, and malpractice.  We held that the Threlkelds' claims "relate entirely to services to be performed in Colorado and the mere existence of interstate communications relating to those services does not provide a basis for personal jurisdiction over [the Colorado defendants]." *Threlkeld*, ¶ 30.

¶77    In *Cimmaron*, Cimmaron, a Montana corporation, entered into a contract with a Pennsylvania corporation and a Florida resident.  Cimmaron filed suit against the corporation and Florida resident alleging conversion of funds and misappropriation of assets.  Cimmaron conceded that the defendants' actions giving rise to the claims occurred outside of Montana but argued that because it was detrimentally affected by the actions in Montana, the actions resulted in the accrual of the tort claim in Montana. *Cimmaron*, ¶ 17.  Relying on *Bird*, we held that the actions which gave rise to the alleged torts occurred outside Montana and noted that "personal jurisdiction is not acquired through interstate communications made pursuant to a contract that *is to be performed in another state*." *Cimmaron*, ¶¶ 14, 20 (emphasis in original).  We held that "interstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot by itself be considered a 'contact' for justifying the exercise of personal jurisdiction."

34

*Cimmaron*, ¶ 14 (quoting *Edsall Constr. Co. v. Robinson*, 246 Mont. 378, 382, 804 P.2d 1039, 1042 (1991), in turn quoting *Simmons*, 244 Mont. at 91, 796 P.2d at 199.).

¶78 More recently, in *Tackett*, this Court again reiterated that what is significant under an "accrual" analysis is where the events giving rise to the tort claims occurred. Tackett alleged two Florida defendants had procured a wire transfer from him relating to the sale of Florida property. Tackett asserted that his injury arose from a transaction which occurred in Lincoln County and, therefore, the Montana court had personal jurisdiction. We held that defendants' only link to Montana was Tackett and no part of the defendants' course of conduct forming the basis of Tackett's claims occurred in Montana. *Tackett*, ¶ 34. We explained "the transmission into Montana of material statements that the defendant allegedly knows are false or fraudulent is insufficient by itself to establish accrual of a fraud or deceit action in Montana." *Tackett*, ¶ 35. The Court explained:

> *In analyzing accrual in each of these cases, we focused on where the events giving rise to the tort claims occurred, rather than where the plaintiffs allegedly experienced or learned of their injuries.* In *Bi-Lo*, Alpine's alleged mishandling of Bi-Lo's check took place in Colorado. In *Bird*, [the Idaho attorney's] alleged fraud, deceit, and conversion arose from actions that [the attorney] took in Idaho. In *Threlkeld*, the defendant's alleged malpractice and misrepresentations regarding the horse's treatment occurred in Colorado. In *Cimmaron*, the defendants' conversion and misappropriation of funds occurred in Pennsylvania.

*Tackett*, ¶ 31 (emphasis added). Further, drawing on federal due process principles, we definitively rejected Tackett's contention that his alleged injury (the loss of the funds he paid the defendant) was sufficient to exercise personal jurisdiction holding "[m]ere injury to a forum resident is not a sufficient connection to the forum." *Tackett*, ¶ 35 (citing *Walden*, 571 U.S. at 290, 134 S. Ct. at 1125; accord *Cimmaron*, ¶¶ 17-20 (the mere fact

35

that the plaintiff was detrimentally affected within Montana by defendant's actions outside Montana is not sufficient to establish accrual of a tort action within this state)).

¶79 Thus, this Court has consistently held that, even though a Montana resident suffers injuries in Montana, there is no personal jurisdiction over torts where the acts giving rise to the claims did not occur in Montana. We reaffirmed this important principle again in *Milky Whey*. Milky Whey is a Montana corporation that operates as a dairy broker supplying food manufacturers in the U.S. and Canada with dairy commodities purchased from suppliers and manufacturers. Dairy Partners is a dairy supply company located in Minnesota. "From 2010 to 2013, Milky Whey and Dairy Partners completed nine purchase orders through telephone, fax, or e-mail, valuing over $181,000." *Milky Whey*, ¶ 4. One of Milky Whey's purchases was for cheese that Dairy Partners shipped to its warehouse in Salt Lake City. The cheese became moldy and Dairy Partners refused to reimburse Milky Whey for the product. Milky Whey filed suit in Montana alleging breach of contract, breach of warranty, unjust enrichment, and breach of obligation to pay. We held there was no personal jurisdiction over Dairy Partners because "a tort does not accrue in Montana when all acts giving rise to the claims occur in another state." *Milky Whey*, ¶ 24. The Court explained that "[h]ere, negotiation, transfer of money, and transfer of product all occurred outside Montana . . . . Focusing on the place where the services were rendered reveals that the alleged [tort] did not accrue in Montana." *Milky Whey*, ¶ 24.

¶80 The Court unsuccessfully tries to distinguish the present controversy from this well-established precedent. The only distinction here, however, is with the method of communication—and we ought not allow technological innovation to subvert the

36

fundamental principles well-grounded in Montana's long-arm statute and constitutional due process. If a nonresident defendant initiating most of nine direct communications by telephone, fax, and email with a Montana corporation selling $181,000 worth of product to the Montana corporation is insufficient to establish personal jurisdiction, then Groo's out-of-state acts giving rise to the alleged torts and her three tags cannot establish personal jurisdiction. We have clearly held the mere fact that the plaintiff was detrimentally affected by a nonresident's out-of-state actions is insufficient to establish personal jurisdiction under the accrual section of Montana's long-arm statute.[4] The key question is did Groo intentionally target Montana or a Montana audience, not whether she intentionally targeted a specific Montana resident or business. I would decline to exercise personal jurisdiction under our long-arm statute because acts committed outside Montana do not "accrue" within Montana simply because the injury is suffered in Montana. Our caselaw has been clear, consistent, and well-reasoned until now. Rule 4(b)(1)(B) is not satisfied where only the injury is suffered in Montana. No other enumerated section applies. Groo's alleged social media campaign may be relevant to a due process inquiry, but it does not establish a basis for exercising personal jurisdiction under Montana's long-arm statute and our case law.

---

[4] The Court inappropriately analogizes the present facts to those of *Ford Motor Co.*, where we held the tort accrued in Montana. In *Ford Motor Co.*, this Court held there was personal jurisdiction because the tort (design defect, failure to warn, and negligence) arose from a vehicle accident occurring in Montana. Thus, the tort obviously accrued in Montana and satisfied Montana's long-arm statute. The significance of *Ford Motor Co.* was that we further determined exercising personal jurisdiction over Ford was constitutionally permissible because Ford did substantial business in Montana, including advertising, selling, and servicing the vehicle the suit claimed was defective. *Ford Motor Co.*, ¶¶ 23, 27. *Ford Motor Co.* does not overrule or question this Court's precedent; rather it built on previously established rules of law and the Supreme Court's decision in *Walden*. However, its stream of commerce discussion and accrual of the tort do not inform the present analysis.

Under Montana precedent, suffering damages alone in Montana will not suffice to establish the tort accrued in Montana. The Court cites the elements of tortious interference of contract, which is not unlike other torts requiring that the act results in actual damage or loss. Opinion, ¶ 32. However, for purposes of personal jurisdiction, the inquiry is clear that where damages are suffered is inconsequential. There is no personal jurisdiction either under Montana's long-arm statute or our case law if all acts constituting the tort—aside from suffering injuries—occurred outside of Montana. The Court's decision to the contrary is a radical departure from our precedent.

## C. Federal Due Process Inquiry.

¶81 If personal jurisdiction, does not exist under Montana's long-arm statute, further analysis under the due process prong is unnecessary. *Cimmaron*, ¶ 10. In any event, exercising jurisdiction over Groo would not comport with the Due Process Clause of the Fourteenth Amendment. Due process requires that an out-of-state defendant have "minimum contacts" with the forum state sufficient to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 343 (1940)). The defendant must "purposefully avail[] [herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," which "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183 (1985) (internal citations omitted).

¶82 The "minimum contacts" inquiry required before a court can exercise personal jurisdiction focuses on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S. Ct. 1473, 1478 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 2580 (1977)). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden*, 571 U.S. at 284, 134 S. Ct. at 1121. Two related aspects of this necessary relationship are relevant. First, the relationship must arise out of contacts the defendant herself creates with the forum state. *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183-84. Further, the Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Walden*, 571 U.S. at 284, 134 S. Ct. at 1122. Due process limits on the State's adjudicative authority protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92, 100 S. Ct. 559, 564 (1980).

¶83 Second, and importantly here, the "minimum contacts" analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285, 134 S. Ct. at 1122. Due process "does not contemplate that a state may make binding a judgment *in personam* against an individual . . . with which the state has no contacts, ties, or relations." *International Shoe*, 326 U.S. at 319, 66 S. Ct. at 160. Thus, the "minimum contacts" analysis focuses on the

39

defendant's contact with the forum, not the defendant's contacts with persons who reside there.

¶84    In *Walden*, the Court reversed the Ninth Circuit Court of Appeals because the lower court "shift[ed] the analytical focus from [the nonresident defendant's] contacts with the forum to his contacts with the [resident plaintiff]." *Walden*, 571 U.S. at 289, 134 S. Ct. at 1124.   The Court rejected the argument that "a defendant creates sufficient minimum contacts with a forum when he (1) intentionally targets (2) a known resident of the forum (3) for imposition of an injury (4) to be suffered by the plaintiff while she is residing in the forum state." *Walden*, 571 U.S. at 289 n. 8, 134 S. Ct. at 1154 n. 8.  The proper question, the Court held, was "not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290, 134 S. Ct. at 1125.

¶85    Contrary to this Court's recitation of distinguishable state authority from lower courts in other states, there is not a single case in which a court has extended, without more, personal jurisdiction based on a defendant's allegedly tortious postings on social media. The weight of authority supports a conclusion contrary to the Court's.  Federal Courts of Appeals have routinely held that "posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside)." *Shrader*, 633 F.3d at 1241.  In *Axiom*, the Ninth Circuit held in a copyright infringement case that a California court lacked specific jurisdiction over a United Kingdom company that sent an allegedly infringing newsletter to 343 email addresses, which included no more than 10

40

recipients in California. The court in *Axiom* held the "[nonresident defendant] sent one newsletter to a maximum of ten recipients located in California, in a market where [the nonresident defendant] ha[d] no sales or clients. The alleged infringement barely connected [the nonresident defendant] to California residents, much less to California itself." *Axiom*, 874 F.3d at 1071. The 8th Circuit has held that "[p]osting on the internet from Colorado an allegedly defamatory statement including the name 'Missouri' in its factual assertion does not create the type of substantial connection between [the nonresident defendant] and Missouri necessary to confer specific personal jurisdiction." *Johnson*, 614 F.3d at 797. In *Blessing*, the Sixth Circuit held that there was no evidence that the users posted the tweets hoping to reach Kentucky specifically as opposed to the Twitter followers generally, although the resident plaintiffs alleged that those messages caused third parties to "dox" the plaintiffs in Kentucky. The Sixth Circuit held that the United States Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between . . . third parties and the forum State." *Blessing*, 988 F.3d at 906. Thus, Courts of Appeals have declined to subject defendants to jurisdiction where the communication was not specifically directed to the forum state. The Fourth and Fifth Circuits have followed a similar analysis. See also *Revell*, 317 F.3d at 475 (nonresident defendant not subject to jurisdiction in Texas because allegedly tortious online post about airplane bombing "was presumably directed at the entire world" and "certainly it was not directed specifically at Texas, which has no especial relationship to the [airplane bombing].""); *Young*, 315 F.3d at 258-59 (declining to subject two Connecticut-based newspapers to jurisdiction in Virginia for publishing online

41

articles defaming a Virginia prison warden because they "did not manifest an intent to aim their websites or the posted articles at a Virginia audience.").

¶86　The error in the Court's analysis is its failure to distinguish between targeting a specific individual and targeting the State of Montana. The first, without the necessary minimum contacts, is insufficient to confer specific jurisdiction. Had Groo targeted the State of Montana and Montana audiences, specific jurisdiction would be appropriate. But, here, Groo tagged three individuals pursuant to her national forum specific to the wildlife photography industry. Neither the facts nor the law support the Court's decision.

¶87　I would, first, hold that the alleged torts do not satisfy the "accrual" language of Montana's long-arm statute as interpreted and well-established by this Court. Today's decision will mark a drastic and unwise departure from basic principles of specific personal jurisdiction. I would, as this Court should, reject Groo's purposeful availment and injury-related arguments. Groo did not direct her communications to a Montana audience; rather, her communications were directed to a national audience of wildlife photographers. Triple D does not seriously allege Groo has contacts in Montana. Secondly, based on *Walden*, guidance from federal Courts of Appeals, and our own precedent, it is my opinion that there are insufficient minimum contacts between Groo and Montana to comport with due process constitutional requirements. A nonresident defendant who makes statements on social media about a forum plaintiff is not subject to personal jurisdiction in the forum state unless she specifically targets the forum state itself or specifically targets residents of the state as the audience. This is true even if the nonresident defendant intended to injure the plaintiff and knew the plaintiff's injury would occur in the forum state. In my view,

42

the Court's decision is wrongly tethered to the injury of a targeted Montana resident which, without more, is insufficient to establish specific personal jurisdiction.

/S/ LAURIE McKINNON

Justices Ingrid Gustafson and Dirk Sandefer join in the Dissent of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR